Gardner *v.* Allegheny County, Appellant.

Argued June 3, 1954; reargued March 22, 1955.
Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY,
MUSMANNO and ARNOLD, JJ.

90

*Maurice Louik,* Assistant County Solicitor, with him *Nathaniel K. Beck,* County Solicitor for Allegheny County, Appellant.

*J. Henry O'Neill,* with him *J. Garfield Houston, Stephen E. Nash* and *Blaxter, O'Neill & Houston,* for airlines, appellants.

*William A. Blair,* with him *David B. Fawcett, William S. Marshall* and *Griggs, Moreland, Blair & Douglass,* for appellees.

*James L. Highsaw,* Chief, Litigation and Research Division, Civil Aeronautics Board, with him *Stanley N. Barnes,* Assistant Attorney General, *John W. McIlvaine,* United States Attorney, *James E. Kilday* and *Albert Parker,* Special Assistants to the Attorney General; *Frank M. Stone,* General Counsel of the Civil Aeronautics Board, *John H. Wanner,* Associate General Counsel, *O. D. Ozment,* Chief, Litigation and Research Division, *Gerald F. Krassa,* Attorney, of Civil Aeronautics Board; *Robert P. Boyle,* General

Counsel of the Civil Aeronautics Administration, and *Gerald F. White,* Chief, Enforcement and Litigation Division, of Civil Aeronautics Administration, for Civil Aeronautics Board and Administrator of Civil Aeronautics, amici curiae.

OPINION BY MR. JUSTICE BELL, May 23, 1955:

Plaintiffs are the owners of certain tracts of land in Moon Township, Allegheny County, Pennsylvania. Their properties were bought and their homes built before the ground was acquired for an airport. These five tracts are located about 1,000 feet or more distant from the Northeast end of the Northeast-Southwest runway, one of three runways of the greater Pittsburgh Airport. The airport, which was erected and is owned and maintained by the County of Allegheny, has been used since June, 1952 as a commercial air terminal by virtue of leases of its facilities to the air lines which are co-defendants.

The property owners aver in their bill of complaint that in landing upon and taking off from the airport, defendants' planes descend or ascend along what is known as the glide angle. Starting at the Northeast end of the paved portion of the Northeast-Southwest runway, which points toward plaintiffs' properties, this glide angle or path of glide slopes upward at the rate of one foot vertically for each forty feet horizontally for a distance of five miles which is the limit of the approach or control zone. The plaintiffs further aver that the glide angle, as it crosses their premises, *is below the floor of the navigable air space* and *about fifteen to thirty feet above the chimneys of their respective houses.* They complain that in landing at and taking off from the airport the defendant airlines have *committed repeated trespasses* and will continue to trespass over their properties. The (minimum) floor of

the navigable air space* is five hunded feet above the ground in rural areas and one thousand feet in congested areas like this one and is prescribed by the Civil Aeronautics Board and is concurred in by the Pennsylvania Aeronautics Commission.

The land owners complain that as a result of these take-offs and landings, which at times amount to as many as eight flights in ten to fifteen minutes, they have suffered from noises, vibrations, lights, and other nuisances when planes fly over their homes; that their sleep and rest are interrupted and disturbed; that normal as well as telephone conversations are interfered with; that the entertainment of guests and visitors is rendered embarrassing; and that *the low flights constitute a real danger* to the occupants of their properties.

The complaints further charge that the repeated trespasses by the County and the airline defendants have completely destroyed the value of the plaintiffs' lands and that the County has not acquired the plaintiffs' properties by condemnation, although it has the power to do so.

To summarize: Plaintiffs allege (1) continuing trespasses which endanger their homes and their safety, and (2) a "taking" of their respective properties.

Plaintiffs, in their prayers for relief, ask alternatively for (1) an injunction restraining all commercial airliners from flying over plaintiffs' properties *below the floor of the navigable airspace* in landing at or taking off from Greater Pittsburgh Airport, or (2) payment to plaintiffs by defendants of the present fair market value of their respective properties as if there were no air operations at the airport.

---

* Navigable air space is defined by the Civil Aeronautics Act of 1938 as "air space above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority".

The County and the airlines separately filed preliminary objections to the complaint contending that the Court of Common Pleas of Allegheny County sitting in Equity lacked jurisdiction because of the absence of indispensable parties, and the County also contended that the Court lacked jurisdiction over the cause of action.

Defendants, upon the overruling of their preliminary objections, took an appeal under the Act of March 5, 1925, P.L. 23, 12 PS 672. The five separate actions have been consolidated and were heard and will be considered as one appeal. We have had the benefit of two able oral arguments.

Defendant airlines aver that their flights are made in accordance with the regulations of the Civil Aeronautics Board which has exclusive control over the operations, take-offs and landings of commercial airplanes and while they relied on this in their first oral argument they later stated that they do not press this objection "on this appeal for the reason that it does not raise a jurisdictional question." On the other hand, Allegheny County, one of the defendants, undoubtedly contended ab initio and still contends (a) that the Court had no jurisdiction to grant equitable relief (i.e., no jurisdiction over the cause of action, which they argued was a claim for a "taking"), and (b) that certain Federal regulatory agencies and officers, viz., The Civil Aeronautics Board and The Civil Aeronautics Administrator, are indispensable parties to this action and should be joined. The governmental authorities who intervened as amici curiae deny that they are either necessary or indispensable parties, even though in many respects they minutely control and regulate the take-off approach and landing of planes at this airport.

Defendants by their "preliminary objections admit as true all facts which are averred in the bill of complaint but not the pleaders' conclusions or averments of law": *Narehood v. Pearson,* 374 Pa. 299, 302, 96 A. 2d 895. Moreover, when the sustaining of defendants' preliminary objections will result in a denial of plaintiffs' claim, or a dismissal of plaintiffs' suit, preliminary objections should be sustained only in cases which are clear and free from doubt: *London v. Kingsley,* 368 Pa. 109, 81 A. 2d 870; *Waldman v. Shoemaker,* 367 Pa. 587, 80 A. 2d 776.

Although the cases at bar will ultimately require the determination of very important complex issues and conflicting interests, the sole question before us at this time is the limited question of jurisdiction, namely: (a) Has the Court jurisdiction of the defendants and were all necessary and indispensable parties joined; and (b) Did plaintiffs state *a cause of action* over which a Court of Equity has jurisdiction? *Welser v. Ealer,* 317 Pa. 182, 176 A. 429; *Com. ex rel. Shumaker v. New York and Pennsylvania Co., Inc.,* 367 Pa. 40, 79 A. 2d 439; *Upholsterers' International Union v. United Furniture Workers,* 356 Pa. 469, 52 A. 2d 217; *Witney v. Lebanon City,* 369 Pa. 308, 85 A. 2d 106; *Zerbe Township School District v. Thomas,* 353 Pa. 162, 44 A. 2d 566.

In the *Shumaker* case, 367 Pa., supra, the Court said (at page 46), quoting with approval from the *Upholsterers' International Union* case: ". . . 'The procedure prescribed by the Act of 1925 for testing jurisdiction "in the court of first instance" applies to questions of jurisdiction either of the defendant or of the subject-matter: Welser v. Ealer, 317 Pa. 182, 184, 176 A. 429. . . .' . . .".

In *Welser v. Ealer,* 317 Pa., supra, this Court said (pages 183-184) : "This case is before us by virtue of

the provisions of the Act of 1925, P.L. 23, authorizing an appeal from the preliminary determination of the lower court's 'jurisdiction over the defendant or of *the cause of action** for which suit is brought.' The action is in trespass to recover damages for injuries resulting from an automobile accident. . . Manifestly it has jurisdiction over the cause of action alleged in the statement, namely, trespass to recover damages for personal injuries. No other matters are open for inquiry in proceedings of this nature. Jurisdiction of the cause of action, as used in the statute, relates 'solely to the competency of the particular court to determine controversies of the general class to which the case then presented for its consideration belongs': Skelton v. Lower Merion Twp., 298 Pa. 471, 473. See also Koontz v. Messer, 314 Pa. 434."

Nowhere in the complaint is any averment made that the Federal or governmental agencies or officers who regulate or control plane flights have committed any trespass or any taking, nor do plaintiffs seek to enjoin them or to recover damages from them. The Federal agencies, we repeat, deny that they are necessary or indispensable parties, and admit the flights violated Federal regulations if they were below or outside the navigable airspace appropriated by Congress or if they were 15-30 feet above plaintiff's homes.

The question of indispensable parties raises a jurisdictional question and consequently may be considered under the Act of 1925: Cf. *Powell v. Shepard,* 381 Pa. 405, 113 A. 2d 261; *Fineman v. Cutler,* 273 Pa. 189, 193, 116 A. 819; *Merner v. Department of Highways,* 375 Pa. 609, 612, 101 A. 2d 759; *Hartley v. Langkamp & Elder,* 243 Pa. 550, 90 A. 402. In *Fineman v. Cutler,* 273 Pa. supra, the Court said (page 193) : " 'One must be joined who otherwise, not being bound by the de-

---

* Italics throughout, ours.

cree, might assert a demand . . . which would be inequitable after the [principal defendants'] performance of a decree in favor of the plaintiff'; and, again, 'A party is indispensable when he has such an interest that a final decree cannot be made without affecting it or leaving the controversy in such a condition that the final determination may be wholly inconsistent with equity and good conscience'; . . .". We hold that the Federal Agencies and Federal Officers are not necessary and indispensable parties.

The airlines would have us limit this opinion to the question of indispensable parties, alleging that that was the only question raised in *their* "Statement of the Questions Involved". Nevertheless, in their brief at the first argument they discussed the Civil Aeronautics Act which is pertinent and necessary in any determination of the cause of action, and the other defendant, namely, Allegheny County, contended the Court lacked jurisdiction over the cause of action. On the reargument all parties exhaustively briefed and ably argued the question of jurisdiction over the cause of action.

When a question of jurisdiction is raised or involved, neither the appellants nor all of the parties combined can limit the Court's determination of jurisdiction to one point and exclude all others which pertain to jurisdiction. There are many precedents for this Rule, the most recent one being *Jacobs v. Fetzer*, 381 Pa. 262, 112 A. 2d 356. In that case the Burgess and Council of Ridley Park appealed from a final decree of a Court of Equity which held a zoning ordinance to be unconstitutional. Although neither the appellants nor the appellee nor the Court below questioned or challenged Equity's jurisdiction and although neither party raised or briefed or orally argued that question in this Court, this Court of its own motion

dismissed the appeal on the ground that Equity had no jurisdiction. See to the same effect *Fineman v. Cutler*, 273 Pa. 189, 193, 116 A. 819.

In *Bourdieu v. Pacific Western Oil Co.*, 299 U.S. 65, the Court said (pp. 70, 71): "The rule is that if the merits of the cause may be determined without prejudice to the rights of necessary parties, absent and beyond the jurisdiction of the court, it will be done; and a court of equity will strain hard to reach that result. West v. Randall, 2 Mason 181, 196 (opinion by Mr. Justice STORY); Cole Silver Mining Co. v. Virginia & G.N.W. Co., 1 Sawyer 685, 689, (opinion by Mr. Justice FIELD); Story's Equity Pleadings, 8th ed., §§77, 96. And see Russell v. Clarke's Executors, 7 Cranch 69, 98; Elmendorf v. Taylor, 10 Wheat. 152, 167-168. Cf. Equity Rule 39.

". . .

"If it be urged that the United States is an indispensable party and, hence, that the court may not proceed even to inquire whether the bill states a cause of action, the answer is that good sense suggests precisely the contrary." In *Forgione v. United States*, 202 F. 2d 249, the Court said: *"Jurisdiction may not be conferred or waived by the parties and it is the court's duty to determine its existence."*

Apart from precedent, a careful analysis will demonstrate the lack of merit in this contention of the Airlines. If this Court is limited to a consideration of "necessary or indispensable parties", we could not properly decide whether a Court of Equity had jurisdiction of plaintiffs' claim for damages for a "taking" or whether low, dangerous flights over plaintiffs' homes below the navigable airspace—which are admitted by the pleadings—could be enjoined. What would be the result? The litigants would go back to the Court below and produce at tremendous labor, time

and expense voluminous testimony as to frequent trespasses 15-30 feet above plaintiffs' homes or below or outside the necessary airspace for safe take-offs and landings and also as to the subject of a "taking" and the value of plaintiffs' property before and after the taking or whatever measure of damages each party believed was the pertinent measure. The Chancellor would then spend considerable time (a) studying the voluminous testimony and the extensive briefs sur the many difficult legal questions involved and thereafter (b) making findings of fact and conclusions of law; the Court en banc would review the many exceptions which would undoubtedly be filed; and after a final decision by that Court the losers would, in all likelihood, appeal to this Court. If plaintiffs appealed from the lower Court's holding that it had no jurisdiction to issue an injunction against frequent low, dangerous flights over plaintiffs' homes, or (2) if defendants appealed from an award of damages by a Court of Equity for a "taking", on the ground that Equity had no jurisdiction—thus raising the identical issues which are now before us—and we should then decide the jurisdictional issue in favor of plaintiffs in the first illustration and the jurisdictional issue in favor of the defendants in the second illustration—wouldn't the litigants and their attorneys feel aggrieved?

To summarize: Upon reason and authority it is clear that the Court has the power sua sponte to decide the important and essential two-fold questions which are always necessarily involved in an appeal under the Act of 1925, i.e., the jurisdiction of the lower Court (a) over the parties defendants and (b) over the cause of action.

Have plaintiffs pleaded a cause of action over which a Court of Equity has jurisdiction, namely, frequent dangerous flights below the navigable airspace?

## Navigable Air Space Below or Outside the Minimum Safe Altitudes of Flight

In recognition of the rapidly growing nationwide (and worldwide) air commerce throughout our Country, Congress enacted the Civil Aeronautics Act of 1938,* which was designed to promote, control, develop and minutely regulate our air transportation system and adapt it to the national public interest. This Act of Congress, *which preempted a national navigable airspace and defined it as the airspace above the minimum safe altitudes of flight* which they authorized the Civil Aeronautics Authority and later the Civil Aeronautics Board to prescribe, was based not upon the Federal Government's ownership of all airspace or even all navigable airspace, but was *founded and based upon the interstate commerce power of Congress.* Congress, by virtue of the Interstate Commerce clause, has paramount power and control over the air, just as it has over navigable streams and interstate commerce on land. *But this power of Congress over interstate commerce is not exclusive,* as has been demonstrated by a myriad of decisions sustaining State power in connection with interstate commerce on land and over navigable streams, as well as by the Aeronautics Act itself, and cases interpreting it. Furthermore, the remedies provided by the Act are, according to §676, *"not exclusive".*

In *Braniff Airways v. Nebraska State Board,* 347 .U.S. 590, the United States Supreme Court said (pp. 594-597) : "Appellant argues that federal statutes governing air commerce enacted under the commerce power *pre-empt the field of regulation of such air commerce* and preclude this tax. Congress, by the Civil Aeronautics Act of 1938, 52 Stat. 973, 977, 1028, §1107 (i) (3),

---

* Citation infra.

49 U.S.C. §176 (a), enacted: 'The United States of America is declared to possess and exercise complete and exclusive national sovereignty in the air space above the United States, including the air space above all inland waters and the air space above those portions of the adjacent marginal high seas, bays, and lakes, over which by international law or treaty or convention the United States exercises national jurisdiction.' This provision originated in the Air Commerce Act of 1926, 44 Stat. 568, 572, §6. The 1938 Act also declares 'a public right of freedom of transit' for air commerce in the navigable air space to exist for any citizen of the United States. 52 Stat. 980, §3, 49 U.S.C. §403.

"The provision pertinent to sovereignty over *the navigable air space* in the Air Commerce Act of 1926 was an assertion of exclusive national sovereignty. The convention between the United States and other nations respecting international civil aviation ratified August 6, 1946, 61 Stat. 1180, accords. *The Act,* however, *did not expressly exclude the sovereign powers of the states.* H. R. Rep. No. 572, 69th Cong., 1st Sess., p. 10. The Civil Aeronautics Act of 1938 gives no support to a different view. After the enactment of the Air Commerce Act, more than twenty states adopted the Uniform Aeronautics Act. It had three provisions, indicating that the states did not consider their sovereignty affected by the National Act except to the extent that the states had ceded that sovereignty by constitutional grant. The recommendation of the National Conference of Commissioners on Uniform State Laws to the states to enact this Act was withdrawn in 1943. Where adopted, however, it continues in effect. See United States v. Praylou, 208 F. 2d 291. Recognizing this 'exclusive national sovereignty' and right of freedom in air transit, *this Court* in *United*

*States v. Causby, 328 U.S. 256, 261, nevertheless held that the owner of land might recover for a taking by national use of navigable air space, resulting in destruction in whole or in part of the usefulness of the land property.* *

"These Federal Acts regulating air commerce are bottomed on the commerce power of Congress, not on national ownership of the navigable air space, as distinguished from sovereignty. In reporting the bill which became the Air Commerce Act, it was said:

'The declaration of what constitutes navigable air space is an exercise of the same source of power, the interstate commerce clause, as that under which Congress has long declared in many acts what constitutes navigable or nonnavigable waters. The public right of flight in the navigable air space owes its source to the same constitutional basis which, under decisions of the Supreme Court, has given rise to a public easement of navigation in the navigable waters of the United States, regardless of the ownership of the adjacent or subjacent soil.' H. R. Rep. No. 572, 69th Cong., 1st Sess., p. 10.

"The commerce power, since Gibbons v. Ogden, 9 Wheat. 1, 193, has comprehended navigation of streams. Its breadth covers all commercial intercourse. But the federal commerce power over navigable streams does not prevent state action consistent with that power. Gilman v. Philadelphia, 3 Wall. 713, 729. Since, over streams, Congress acts by virtue of the commerce power, the sovereignty of the state is not impaired. Oklahoma v. Atkinson Co., 313 U.S. 508, 534. The title to the beds and the banks are in the states and the riparian owners, subject to the federal power over navigation. Federal regulation of interstate land and

---

* Italics ours.

water carriers under the commerce power has not been deemed to deny all state power to tax the property of such carriers. We conclude that existent federal air-carrier regulation does not preclude the Nebraska tax challenged here."

It is hornbook law that a Court of Equity possesses jurisdiction to enjoin repeated trespasses on land, as well as to enjoin a nuisance.* In *Tri-Cities Water Co. v. Monessen*, 313 Pa. 83, 85, 169 A. 159, it is said: "There is no doubt equity has power to grant a restraining order preventing actual or threatened trespasses of a continuing and permanent character: Gray v. Phila. & Reading Coal & Iron Co., 286 Pa. 11."

Where planes fly frequently over the land of a property owner either in interstate or in intra-state commerce below the minimum safe altitudes of flight and so low or in such manner as to endanger the life or property of the complainant, the authorities hold—and we believe wisely hold—(a) they may be enjoined by a State Court as unlawful trespasses or as a nuisance (if the facts in the particular case warrant it), and/or (b) they may injure or destroy the usefulness of the property to such an extent as to amount to a "taking", for which an appropriate State or Federal Court may award damages: *Crew v. Gallagher*, 358 Pa. 541, 58 A. 2d 179; *United States v. Causby*, 328 U. S. 256; *Reynolds v. Wilson*, 67 D. & C. 286 [1949]; *Delta Air Corporation v. Kersey*, 193 Ga. 862, 20 S.E. 2d 245;

---

* *Sullivan v. Jones & Laughlin Steel Co.*, 208 Pa. 540, 57 A. 1065; *Edmunds v. Duff*, 280 Pa. 355, 124 A. 489; *Pennsylvania Co. v. Sun Co.*, 290 Pa. 404, 138 A. 909; *Denhart v. Valicenti*, 157 Pa. Superior Ct. 143, 41 A. 2d 884; *Heinel v. Pecher*, 330 Pa. 232, 198 A. 797; Pomeroy's Equity Jurisprudence, Fifth Ed., §§1350, 1357; 28 Am. Jur., Injunctions, §137; 39 Am. Jur., Nuisances, §§153, 158; 43 C.J.S., Injunctions, §§57, 64; 66 C.J.S., Nuisances, §110.

*Vanderslice v. Shawn,* 27 A. 2d 87, (Del. Ch.) ; *Burnham v. Beverly Airways,* 311 Mass. 628, 42 N.E. (2d) 575; *Neiswonger v. Goodyear Tire & Rubber Co.,* 35 F. (2d) 761 (Ohio) ; *Thrasher v. City of Atlanta,* 178 Ga. 514, 173 S.E. 817; *Swetland v. Curtiss Airports Corp.,* 41 F. (2d) 929 (Ohio) ; *Dlugas v. United Air Lines,* 53 D. & C. 402; Cf. also *Braniff Airways v. Nebraska State Board,* supra.

In *Crew v. Gallagher,* 358 Pa., supra, [1948], this Court, in discussing the application for an injunction against a proposed airport, said: (page 547) : "Although the Aeronautical Code of May 25, 1933, P.L. 1001, and the Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C. §171, as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. §401, diminish the absolute rights that landowners had to the space above the surface of their land under the common law, *they do not authorize the flight of aircraft at such low altitudes as to interfere with the reasonable use and enjoyment of land.* . . . if airplanes fly very close to plaintiffs' buildings, or in any other way cause real damage to plaintiffs' property, *adequate relief in equity will be available to them."*

Section 402 of the Pennsylvania Aeronautical Code of May 25, 1933, P.L. 1001, reads as follows:

"Section 402. Lawfulness of Flight.—Flight in aircraft over the lands and waters of this Commonwealth is lawful, unless at such low altitude as to interfere with the then existing use to which the land or water, or the space over the land or water, is put by the owner, or *unless so conducted as to be dangerous or damaging to persons or property lawfully on the land* or water beneath. The landing of an aircraft on the lands or waters of another without his consent is unlawful, except in the case of a forced or emergency landing. For damage caused by a forced or emergency

landing, the owner, lessee, and operator of the aircraft shall be liable, as provided in section four hundred three."

In *Reynolds v. Wilson*, 67 D. & C. 286, [1949] a State Court enjoined the flying over plaintiffs' property at a height of less than 130 feet above the ground level *when taking off or landing and from flying at less than 500 feet above plaintiffs' property in other flights.* BRAHAM, P. J., in a learned opinion, said (pp. 292-3) :

"There are many persuasive precedents on the point, indicating how resolutely the law continues to safeguard the interests of the owner of the surface notwithstanding the great public interest in air transportation. In Delta Air Corp. et al., Kersey v. City of Atlanta, 193 Ga. 862, 20 S.E. (2d) 245, defendant's runway was within 300 feet of plaintiff's house and planes therefrom flew over plaintiff's house at heights of from 25 to 50 feet [during take-offs and landings]. This was held to constitute a nuisance and was enjoined. In Vanderslice et al. v. Shawn et al., 27 A. (2d) 87 (Del. Ch.), flights so low as to interfere with existing uses were held to be trespass whether in taking off or landing in full flight. An injunction was granted. In Burnham et al. v. Beverly Airways, 311 Mass. 628, 42 N.E. (2d) 575, it was held that flights of aircraft below the reasonable heights fixed by the Aeronautics Commission constituted a trespass justifying an injunction.[1] In Neiswonger v. Goodyear Tire & Rubber Co. et al., 35 F. (2d) 761 (Ohio), an allegation of the flight of a dirigible below the 500-feet limit fixed by commission action was held on demurrer to constitute a good averment of trespass. A similar ruling as to aircraft is found in Thrasher v. City of Atlanta et al., 178 Ga. 514, 173 S.E. 817. In Swetland v. Curtiss Airports Corp. et

---

[1] Defendant was enjoined from flights under 500 feet even in take-offs and landings.

al., 41 F. (2d) 929 (Ohio), the imposition of a 500-feet minimum flight level was sustained as a valid exercise of the police power and the probability of flights at less than 500 feet even in taking off and landing was held to amount to a nuisance.

"In Pennsylvania the Supreme Court recently considered the right of a surface owner to be protected from flights of airplanes in Crew et al. v. Gallagher et al., 358 Pa. 541. There plaintiffs sought to enjoin the building of an airport in an agricultural district. It was held that an airport is not of itself a nuisance and that under the peculiar circumstances of the case plaintiffs were not entitled to relief but the court by Mr. Justice Drew said in closing: [page 548]

" 'After the establishment of a regular flight traffic pattern, if airplanes fly very close to plaintiffs' buildings, or in any other way cause real damage to plaintiffs' property, adequate relief in equity will be available to them.'

"In Dlugas et ux. v. United Air Lines, etc., et al., 53 D. &. C. 402, the Common Pleas Court of Lehigh County enjoined the operation of planes *when taking off and landing* at a height of less than 100 feet.

"It may be observed in concluding this feature of the case that A.L.I. Restatement of the Law of Torts, §194, considers flights of aircraft over the lands of another to be privileged only if at a height so as not to interfere unreasonably with the possessor's enjoyment of the surface and the air space above it[*] and if in conformity with regulations of the aeronautical authorities."

---

[*] §194, illustration 4; A flies in an airplane over B's house within 200 feet of the roof, thereby causing annoyance and fear of harm to B and the other occupants of B's house. A is a trespasser.

In *Vanderslice v. Shawn,* 27 A. 2d, (Del. Ch.) supra, the Court enjoined repeated low flights over the plaintiffs' land *occurring in landings or take-offs,* and said (page 90) :

"[2, 3] No complaint is made concerning flights at altitudes over 500 feet, and respondents claim no privilege to fly planes at lower altitudes except in landing and taking off. *Whether in landing, taking off, or otherwise,* flight over another's land, so low as to interfere with the then existing use to which the land is put, is expressly outside of the statutory definition of lawful flight; and being an unprivileged intrusion in the space above the land, *such flight is a trespass.* 1 Restatement of Torts, Sec. 159. Extensive flying at low altitudes, accompanied by excessive noise and occasioning unreasonable annoyance to the occupants of the land below, and apprehension of danger on their part, has been held to constitute an element of nuisance in that it interferes substantially with the enjoyment of the property by the occupants. [Cases cited]."

Defendants, as well as the Federal Agencies, admit that interstate flights while cruising or in course of flight below 1000 feet over congested areas, or 500 feet over other than congested areas, may be enjoined by a State Court. However, the defendants contend that plaintiffs are barred from injunctive relief in the instant case because the trespasses complained of occurred in take-offs and landings and these are authorized by Regulation 60.17,* Air Traffic Rules of the Civil Air Regulations which was promulgated by the Civil Aeronautics Board pursuant to the Civil Aeronautics Act of 1938, and by its terms became effective on October 8, 1947.

---

* This slightly changed an earlier regulation which provided: "Exclusive of taking off from or landing upon an airport or other landing area, etc."

The Acts of Congress, as above noted, appropriate for air travel the navigable air space throughout the United States and then *define navigable air space as "air space above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Board* (formerly Authority)". The Board's Regulation 60.17 provides: "Regulation 60.17. Minimum Safe Altitudes. *Except when necessary\* for take-off or landing* no person shall operate an aircraft below the following altitudes:

"(a) Anywhere. An altitude which will permit, in the event of the failure of a power unit, an emergency landing without undue hazard to persons or property on the surface;

"(b) Over congested areas. Over the congested areas of cities, towns or settlements, or over an open-air assembly of persons, an altitude of *1,000 feet* above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft. . . .

"(c) Over other than congested areas. An altitude of 500 feet above the surface, except over open water or sparsely populated areas. In such event, the aircraft shall not be operated closer than 500 feet to any person, vessel, vehicle, or structure. . . ."

It is important to note that the Act of Congress does not define what it meant by "the minimum safe altitudes of flight" which it authorized the Civil Aeronautics Board to prescribe, and it nowhere specifically refers to take-offs or landings in connection with navigable air space or with minimum safe altitudes of flight. Regulation 60.17 *specifically* defines in terms of "feet" the minimum safe altitudes of flight over congested areas and uncongested areas, *but does not specifically or expressly prescribe* or define navigable air space or minimum safe altitudes of flight *in connection with take-offs or landings.*

The defendants and the Federal Agencies contend (a) that the Agencies have the authority and power to prescribe the necessary or requisite air space for take-offs and landings ex necessitate as well as under the express Congressional authority to prescribe "the minimum safe altitudes of flight" and (b) that they have expressly appropriated in and by Regulation 60.17 "whatever airspace is necessary for take-off or landing."

Regulation 60.17 defines and prescribes the air space appropriated for take-offs and landings, if at all,* only negatively and by implication. However, since take-offs and landings are obviously absolutely necessary if there are to be interstate flights, or indeed if there is to be any flying at all, reason and common sense impel the conclusion that Congress must have intended the Federal Agencies to have the right and power to prescribe and appropriate for public use such air space as is *reasonably necessary* for take-offs and landings. This naturally will vary with terrain, wind conditions and other factors and consequently it is difficult and may be impractical and unwise to attempt to more particularly define such air space. However, even if Regulation 60.17 validly appropriates whatever air space is necessary for take-offs and landings, it does not control this case *in the present state of the record,* nor require us to dismiss plaintiffs' complaint.

Whether the flights complained of were or were not *necessary* for take-offs or landings is not averred in any pleading, by any party plaintiff or defendant

---

* The power of the Civil Aeronautics Board to prescribe air space for take-offs and landings is denied by plaintiffs in view of certain language in the Court's opinion in *United States v. Causby,* 328 U. S. infra.

or by the intervenors. Plaintiffs aver that in landing upon and taking off from the airport defendant's planes fly *below the floor of the navigable air space.* Defendants by their preliminary objections necessarily admit these facts. Moreover, *defendants do not* in these pleadings *aver* or contend, nor do the governmental agencies contend *that flights 15-30 feet above a man's home are "necessary"* for safe landings or take-offs or that such flights have ever been authorized by any Act of Congress or by any regulation of the Civil Aeronautics Board; indeed the Federal Agencies admit in their brief that such flights would constitute a violation of the Agencies' regulations. Furthermore, neither the defendants nor the Federal Agencies contend that the enjoining of such flights would stop or directly burden interstate commerce or that planes could not safely land or take off on another path of glide if such flights were enjoined.

The position of the Federal Agencies is clearly set forth in their very able brief from which we adopt the following succinct statements: ". . . judicial relief *ordinarily* should be limited to those circumstances in which either a taking occurs, or in which flight is not in accordance with the Federal regulations. . .

"Where flights lower than are necessary for landing or take-off occur, *such flights are not immunized* by the Civil Aeronautics Act even though no taking of property results therefrom, and further *constitute a violation of the agencies' regulations. . . . the Courts may entertain complaints that unnecessary low flying constitutes a legal nuisance not insulated by federal law."*

"Of course, *flight which is dangerous* because it would pass too close to obstructions on the ground

---

* The Federal Agencies suggest that complaints against low or dangerous flights be presented to the Board instead of to Courts as a matter of comity and under the primary jurisdiction doctrine.

*remains unlawful* under Section 60.12 of the Regulations *even if it were otherwise 'necessary' to effectuate take-off or landing at a certain landing strip."*

Regulation 60.12 which is referred to but not quoted in the brief of the Federal Agencies, reads as follows:

*"Careless or reckless operation.* No person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.

Note Examples . . .

(a) Any person who 'buzzes', dives on, or *flies in close proximity to a farm, home,* any structure, vehicle, vessel, or group of persons on the ground. . . .

(b) The operation of aircraft at an insufficient altitude endangers persons or property on the surface. . . . Such a flight may also constitute a violation of §60.17."

Defendants further contend that plaintiffs' complaint must be dismissed because the planes flew along the glide angle or path of glide ordered by the Federal officer in charge of flights at that airport and that the path of glide is the same as the minimum safe altitude of flight and is part of the navigable air space which was pre-empted by Congress. This contention cannot prevail because (a) under the admitted facts, it is presently irrelevant, and (b) it was apparently rejected by the Supreme Court in *United States v. Causby,* 328 U.S., supra. The Court said (page 263): *"The fact that the path of glide taken by the planes was that approved by the Civil Aeronautics Authority does not change the result* [a taking]. *The navigable airspace which Congress has placed in the public domain is 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.'* 49 U.S.C. §180. If that agency prescribed 83 feet as the minimum safe altitude, then we would have presented

the question of the validity of the regulation. But nothing of the sort has been done. The path of glide governs the method of operating—of landing or taking off. *The altitude required for that operation is not the minimum safe altitude of flight which is the downward reach of the navigable airspace.* . . . the path of glide is not the minimum safe altitude of flight within the meaning of the statute. The Civil Aeronautics Authority has, of course, the power to prescribe air traffic rules. *But Congress has defined navigable airspace only in terms of one of them—the minimum safe altitudes of flight."* It is unnecessary at this time to determine what, if any, effect that language has upon the validity of Regulation 60.17 so far as it pertains to take-offs and landings, since even if Regulation 60.17 be valid and its meaning clear (as the Federal Agencies interpret it), it does not, under the facts herein admitted, preclude plaintiffs from the relief they seek.

Entirely apart from the *Causby* case, the Civil Aeronautics Board admittedly has never adopted a regulation, direction or order which permits frequent inherently dangerous flights—whether in course of flight or in take-offs or landings—15 to 30 feet over a man's home. The important fact in this case which the defendants (the airlines and Allegheny County) overlook is that—irrespective of difficult interpretations of interstate commerce, "navigable air space", "minimum safe altitudes of flight", Regulation 60.17 of the Civil Aeronautics Board, and the relative powers of Federal Agencies and the sovereign States, national airlines, owners of airports and owners of neighboring properties—plaintiffs are confronted with a condition fraught with imminent peril. Under such circumstances, and *especially in the light of the admitted facts,* to deny plaintiffs equitable protection and require them to move from their homes or jeopardize their lives while

they wait for a solution by the Supreme Court of Pennsylvania or the Supreme Court of the United States of all the intricate legal problems involved— that would be placing too large a price on abstract theory and procedure, and too small a price on life.

The two cases cited by Allegheny County do not support their contention that the plaintiffs' complaint should be dismissed. In *Antonik v. Chamberlain*, 78 N.E. 2d 752 (Court of Appeals of Ohio, 1947), neighboring land owners sought an injunction against the erection of a proposed airport. They failed to prove that physical harm or irreparable damage would result from take-offs or landings at heights of less than 500 feet. The Court construed Regulation 60.17 to appropriate such air space over another's land as was "necessary for take-offs or landing" but held that any abuse of this prescribed area would constitute a nuisance which could be enjoined by a State Court.

In *Kuntz v. Werner Flying Service*, 257 Wis. 405 (1950), 43 N.W. 2d 476, the Court refused to grant an injunction to restrain defendants from operating their aircraft over plaintiff's land at an altitude lower than 200 feet in take-offs or landings, in order to protect chickens which stampeded when planes flew over them. The Court construed Regulation 60.17 to mean that a right is given to fly over the lands of others at heights of less than 500 feet *when necessary for take-off or landing,* but refused an injunction because it would cause tremendous expense and harm to the defendants and plaintiffs had failed to prove any substantial or irreparable injury. However, the Court cited with approval *Maitland v. Twin City Aviation Corp.,* 254 Wis. 541 (1949), 37 N.W. 2d 74, where the same Court had enjoined flights lower than permitted by flying regulations in take-offs or landings. The *Kuntz* decision was a recognition of the well established prin-

ciple that acts which are pro bono publico and which cause incidental damages which are relatively unsubstantial should not be enjoined. A neighboring landowner should not have the right to enjoin the flight of progress by pleading merely noise, inconvenience, unpleasantness and some relatively slight damage. Cf. *Richards v. Washington Terminal Co.*, 233 U. S. 546; *Pennsylvania R. Co. v. Lippincott*, 116 Pa. St. 472, 9 Atl. 871 (1887); *Pennsylvania R.R. Co. v. Marchant*, 119 Pa. 541, 13 Atl. 690.

The aforesaid Ohio case and Wisconsin case restrict the right of a landowner more than other Courts have done, but they recognize the right and power of a State Court to enjoin interstate flights when they are lower than flying regulations permit; and even if followed, they do not require a dismissal of plaintiffs' complaint.

We therefore hold (1) that Congress has not preempted the field of navigable air space below or outside the minimum safe altitudes of flight and (2) that the minimum safe altitudes of flight for planes flying in interstate commerce *in course of flight* have been clearly and specifically defined by the Civil Aeronautics Board in Regulation 60.17; and (3) that State Courts have the jurisdiction and power which Congress has neither limited nor destroyed to enjoin trespasses arising from frequent interstate or intra-state flights over a landowner's property below or outside the minimum safe altitudes of flight.

In view of the fact that the pleadings do not show that these flights are within or above the airspace *necessary* for safe take-offs or landings, we need not and do not decide whether a State Court can enjoin flights which are within the airspace *necessary* for safe take-offs or landings if such flights imminently endanger plaintiffs' life or property.

## Damages for a "Taking"

As an alternative complaint and request for relief, petitioners ask the Court of Equity to find that the acts of the defendants constitute a "taking" and to determine and award to plaintiffs the *fair market value* of their property as if no airfield existed in their neighborhood. To this alternative complaint defendants filed preliminary objections which the lower Court overruled.

The Supreme Court of the United States in *United States v. Causby*, 328 U.S., supra, specifically decided that flights which are so low and so frequent as to be a direct and immediate interference with the usefulness of the land, constitute a "taking". In that case the Court said (pp. 260, 261-264, 266) : "I. The United States relies on the Air Commerce Act of 1926, 44 Stat. 568, 49 U.S.C., §171, as amended by the Civil Aeronautics Act of 1938, 52 Stat. 973, 49 U.S.C. §401. Under those statutes the United States has 'complete and exclusive national sovereignty in the air space' over this country. 49 U.S.C. §176(a). They grant any citizen of the United States 'a public right of freedom of transit in air commerce through the *navigable* air space of the United States.' 49 U.S.C. §403. And 'navigable air space' is defined as 'airspace above the minimum safe altitudes of flight prescribed by the Civil Aeronautics Authority.' . . . the United States conceded on oral argument that if the flights over respondents' property rendered it uninhabitable, there would be a taking compensable under the Fifth Amendment. . . . If, by reason of the frequency and altitude of the flights, respondents could not use this land for any purpose, their loss would be complete. It would be as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it.

"We agree that in those circumstances there would be a taking. Though it would be only an easement of flight which was taken, that easement, if permanent and not merely temporary, normally would be the equivalent of a fee interest. It would be a definite exercise of complete dominion and control over the surface of the land. The fact that the planes never touched the surface would be as irrelevant as the absence in this day of the feudal livery of seisin on the transfer of real estate. The owner's right to possess and exploit the land—that is to say, his beneficial ownership of it—would be destroyed. . . .

"*The fact that the path of glide taken by the planes was that approved by the Civil Aeronautics Authority does not change the result.* . . .

"We have said that the airspace is a public highway. Yet it is obvious that if the landowner is to have full enjoyment of the land, he must have exclusive control of the immediate reaches of the enveloping atmosphere. Otherwise buildings could not be erected, trees could not be planted, and even fences could not be run. The principle is recognized when the law gives a remedy in case overhanging structures are erected on adjoining land. The landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land. See Hinman v. Pacific Air Transport, 84 F. 2d 755. The fact that he does not occupy it in a physical sense—by the erection of buildings and the like—is not material. As we have said, the flight of airplanes, which skim the surface but do not touch it, is as much an appropriation of the use of the land as a more conventional entry upon it. . . .

"The airplane is part of the modern environment of life, and the inconveniences which it causes are normally not compensable under the Fifth Amend-

ment. The airspace, apart from the immediate reaches above the land, is part of the public domain. We need not determine at this time what those precise limits are. Flights over private land are not a taking, unless they are so low and so frequent as to be a direct and immediate interference with the enjoyment and use of the land. . . ."

It is clear as crystal under the authority of *United States v. Causby* that flights over private land which are so low and so frequent as to be a direct and immediate interference with the enjoyment and the use of the land amount to a "taking".

Nevertheless, a Court of Equity has no power or jurisdiction to assess damages for a "taking". The condemnation of property for airdromes and landing fields is authorized by the Act of May 2, 1929, P.L. 1278, Art. V, §496, since reenacted in the Second Class County Code, 16 PS 2151-2401 et seq. Section 2151-2403 provides: "The proceedings for the condemnation of lands under the provisions of this article [Aeronautics] and for the assessment of damages for property taken, injured or destroyed shall be conducted in the same manner as provided [by law for the condemnation of land]."

Art. VII, §518, of the Act of May 2, 1929, P.L. 1278, now reenacted in the Second Class County Code, 16 PS 2151-2608(a), sets forth the provisions for the condemnation of land above referred to. This section provides: "In case the board of commissioners or a majority of them and the parties interested in the land, property or material appropriated, injured or destroyed by the county fail to agree upon the compensation to be made for the land, property or material so taken, injured or destroyed, upon petition . . . to the court of common pleas of said county, the said court shall appoint three viewers from the county board of view-

ers, and appoint a time, . . . when said viewers shall meet and view the land, property or material to be so appropriated, injured or destroyed."

"The said viewers . . . having viewed the premises . . . shall hear all parties interested and their witnesses, and, . . . shall estimate, determine and assess the damages for the land, property or material taken, injured or destroyed, and to whom the same is payable, . . .": Article VII, §523.

That Act specifically directs the appointment of viewers to ascertain, determine and assess damages in any condemnation proceeding when compensation cannot be agreed upon. Nowhere in the Act is there any provision for a Court in Equity to fix and determine the value of plaintiffs' property. This Court, in *Hastings Appeal,* 374 Pa. 120, 97 A. 2d 11, said (page 125) : "A board of view is not a common law remedy; it exists only where it has been provided for by statute: see Locust Street Subway Case, supra, [319 Pa.] at p. 165. *In the situations for which it has been provided, it is the only available remedy*: Power v. Borough of Ridgway, 149 Pa. 317, 318, 24 A. 307; and McKee v. City of Pittsburgh, 7 Pa. Superior Ct. 397, 400; . . .".

Where a statute designates a specific procedure, the remedy so provided is exclusive: *Lukens v. Ridley Township Zoning Board of Adjustment,* 367 Pa. 608, 80 A. 2d 765; *Gerety Estate,* 349 Pa. 417, 37 A. 2d 792; *Keefer Estate,* 351 Pa. 343, 41 A. 2d 666; *Griffith v. McCandless Township,* 366 Pa. 309, 77 A. 2d 430; *Castle Shannon Coal Corporation v. Upper St. Clair Township,* 370 Pa. 211, 88 A. 2d 56.

While there is a well established general principle that once equitable jurisdiction has attached, equity can round out the whole circle of controversy and thus do *complete* justice between the parties: See: *Wortex Mills, Inc. v. Textile Workers Union of America,* 380

Pa. 3, 109 A. 2d 815, and cases cited therein; nevertheless, this principle cannot be extended and gives no power or jurisdiction to a Court of equity to grant relief in matters in which a specific and adequate remedy or different jurisdiction is provided by statute: *United Drug Co. v. Kovacs,* 279 Pa. 132, 123 A. 654; *Century Distilling Co. v. Continental Distilling Co.,* 106 F. 2d 486.

We therefore hold that a Court of Equity has no power or jurisdiction to determine or assess damages for a "taking" of plaintiffs' property and is consequently without jurisdiction to grant that phase of the alternative relief demanded by the plaintiffs. We need not and do not decide in this case who would be liable for such a taking or who would be necessary parties defendant if such a claim were presented in a proper forum.

It follows that the Court below (a) was correct in overruling defendants' preliminary objections to that part of the Bill of Complaint which sought an injunction for trespasses—of course giving defendants leave to file an answer—and (b) was in error in overruling defendants' preliminary objections to plaintiffs' claim for a "taking" of their property.

The decree as thus modified is affirmed and the lower Court is directed to enter a modified decree consistent with this Opinion and to grant such further relief as to it may seem proper. Each party shall pay his or its own costs.

---

CONCURRING OPINION BY MR. CHIEF JUSTICE HORACE STERN:

Based upon its power over commerce, Congress by the Civil Aeronautics Act of 1938, pre-empted a na-

tional navigable airspace and defined it as the airspace above the minimum altitudes of flight prescribed by regulations issued under the Act. It authorized the Civil Aeronautics Board to prescribe such regulations.

The Board's Regulation 60.17 provides that, *Except when necessary for take-off or landing,* an aircraft, flying over congested areas, shall not be operated below 1,000 feet above the highest obstacle within a horizontal radius of 2,000 feet from the aircraft, nor below 500 feet above the surface when flying over other than congested areas except over open water or sparsely populated areas.

Defendants, as well as the Federal agencies, admit that interstate flights conducted below those prescribed minimum altitudes may be enjoined by a State court, —that is to say, if such trespasses are of a continuing character and materially interfere with the landowner's use and enjoyment of his property.

This brings us to the question of take-offs and landings. When Regulation 60.17 excepted these from the prescribed minimum altitudes it in effect declared— as indeed would have been in any event obvious—that in the course of landing and taking off the minimum altitude must be less than the distances fixed for flights en route. How much less? Clearly no specific minimum could be fixed for that purpose, since it would depend in each instance and for each airport on the size and construction of the latter, on the topography of the surrounding land, on the nature, size and weight of the plane, on the conditions of wind and weather, and above all, on the directions of the operator in the tower to whose control the operator of the plane is subject. All that the Regulation said, and could say, was that the minimum altitudes prescribed did not apply when *"necessary for take-off or landing,"* which is another way of saying that the navigable airspace pre-empted

by Congress was the space above whatever altitude was *necessary* for such operations. (On July 22, 1954, the Civil Aeronautics Board issued a clarifying interpretation of Section 60.17 in which it construed the exception as prescribing *a normal and necessary flight path* after take-off or in approaching to land). The State, therefore may enjoin planes in take-offs and landings only if they fly below the *necessary* minimum altitude, and if as previously stated, the trespasses are of a continuing character, and materially interfere with the landowner's use and enjoyment of his property. Whether that necessary minimum be more than 15, 30, or any other specific number of feet, cannot be determined except when the facts are ascertained at the hearing of the case. If it be there established that defendant's planes in take-offs and landings fly below the floor of the navigable airspace as thus defined, and the other conditions above mentioned are found to exist, plaintiffs will be entitled to equitable relief. But it is important to add that, even if planes in landings or take-offs do *not* fly below the necessary minimum altitude governing such operations and therefore cannot be enjoined from such flying they nevertheless materially impair the use and enjoyment of the landowner's property, the latter is entitled to be compensated for the easement thus established over his land (*United States v. Causby*, 328 U.S. 256), and, if the impairment be so great as to constitute a virtually complete taking of his land, to receive payment of the value of the land in proper eminent domain proceedings.

Mr. Justice CHIDSEY and Mr. Justice ARNOLD join in this concurring opinion.

CONCURRING OPINION BY MR. JUSTICE JONES:

These appeals were taken agreeably to the Act of March 5, 1925, P.L. 23, 12 PS §672. The scope of our review is, therefore, to be limited to a determination of the jurisdictional questions raised: *Jones v. Jones*, 344 Pa. 310, 311, 25 A. 2d 327.

The defendants, by preliminary objections, variously question (1) whether the State court may enjoin trespassory flights made beneath the "floor" of the federally defined navigable airspace and lower than is "necessary" for take-offs and landings, (2) whether the Civil Aeronautics Board and the Administrator of Civil Aeronautics are indispensable parties to the proceeding and (3) whether the State equity court has jurisdiction to award damages for what the plaintiffs claim amounts to a taking of their properties.

The ultimate criterion of jurisdiction is the competency of the court to determine controversies of the general class to which the case presented belongs; and jurisdiction is not denied merely because the court may later decide that it is unable to grant the relief sought in a particular case: *Witney v. Lebanon City*, 369 Pa. 308, 312, 85 A. 2d 106. There can be no doubt that equity may enjoin continuing trespasses amounting to a nuisance. Whether the State equity court is inhibited from exercising its jurisdiction in the present matter depends upon whether the alleged trespasses are within the navigable airspace pre-empted by Congress in the Civil Aeronautics Act of 1938. Counsel for the Civil Aeronautics Board and the Administrator of Civil Aeronautics expressly concede in the brief they filed as amici curiae that "Where flights lower than are necessary for landing or take-offs occur, such flights are not immunized by the Civil Aeronautics Act" and "the Courts may entertain complaints that unnecessary low flying constitutes a legal nuisance

not insulated by federal law." Accordingly, the extent to which the State court may exercise its jurisdiction in the premises will be determined by the evidence adduced at trial.

The "floor" of the navigable airspace, *except when necessary for take-offs and landings,* has been administratively set at 500 and 1,000 feet above the ground depending, respectively, on the extent of building on the underlying land area. The mechanics of take-offs, landings and flight are closely regulated and controlled by the Federal Government acting through its appropriate agencies. However, the complaint in the instant case sets forth (and, for present purposes, we are bound to assume) that the flights complained of are but 15 to 30 feet above the roofs of the plaintiffs' dwellings. The issues of fact as to whether such flights are within the permissible range of the navigable airspace for take-offs and landings, whether the alleged low altitudes of flight are necessary under the circumstances and whether the flights are pursuant to federal directions and regulations can be determined only after a hearing on the merits.

Nor is the jurisdiction of the court ousted because of the absence of the Civil Aeronautics Board and the Administrator of Civil Aeronautics. They are not indispensable parties. A party is indispensable where his rights are so connected with the claims of the litigants that no decree can be made between them without impairing such rights: *Powell v. Shepard,* 381 Pa. 405, 113 A. 2d 261; *Hartley v. Langkamp and Elder,* 243 Pa. 550, 556, 90 A. 402. Neither the Civil Aeronautics Board nor the Administrator of Civil Aeronautics bears any such relationship to the instant proceedings. And, their counsel so admit.

But, it is equally clear that a Pennsylvania court, sitting in equity, lacks jurisdiction to assess and award

damages for an appropriation of private property for public use. Relief in such regard is obtainable only by eminent domain proceedings or, where the Federal Government is the taker, on application to the Court of Claims: see *United States v. Causby*, 328 U.S. 256. Of all the defendants here impleaded, only the County of Allegheny possesses the power of eminent domain. Section 496 of the Act of May 2, 1929, P.L. 1278, as re-enacted by the Second Class County Code of 1953, P.L. 723, 16 PS §§2151-2401 et seq., prescribes the procedure for an award of damages when the County is the taker of private property for airdromes and landing fields. Where a statutory remedy has been provided for redress of an injury or wrong, it becomes the exclusive remedy available: *Hastings Appeal*, 374 Pa. 120, 97 A. 2d 11; Section 13 of the Act of March 21, 1806, P.L. 558, 4 Sm. L. 326, 46 PS §156. See, also, *Jacobs v. Fetzer*, 381 Pa. 262, 112 A. 2d 356. It follows, therefore, that the court is without jurisdiction to award damages for the alleged taking of the plaintiffs' properties.

I agree to a remand of the records for further appropriate proceedings to the extent hereinabove indicated.

Mr. Justice CHIDSEY joins in this concurrence.

---

CONCURRING AND DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

The court below in a supplemental order dismissed the preliminary objections of defendant and directed answers to be filed to the complaint.

Two main issues are involved. One is whether or not a court in equity possesses jurisdiction to establish the fact of a "taking" of property and to award com-

pensation therefor. The other is whether a state court has injunctive jurisdiction in equity to prohibit the operation of airplanes when they fly improperly and dangerously low.

When airplanes habitually fly so low as to dangerously interfere with the use and enjoyment of property adjacent to, or adjoining, air fields, whether authorized or not, it constitutes a "taking" of property for which compensation may be allowed: *United States v. Causby*, 328 U.S. 256. I agree that the jurisdiction, and determination, of this question rests in the state courts, but not in *equity*. The Commonwealth has enacted statutes and prescribed procedure relative to "taking" of property. This is by eminent domain. We have consistently decided that where a remedy or method of procedure is provided by an Act, its provisions shall be strictly pursued and *exclusively* applied: *Wojnar v. Yale and Towne Manufacturing Company*, 348 Pa. 595, 598, 36 A. 2d 321; *Era Co., Ltd., v. Pittsburgh Consolidation Coal Co.*, 355 Pa. 219, 220, 49 A. 2d 342. For this reason I am of opinion that a court in equity has no jurisdiction to decree that a "taking" has occurred and to award compensation.

It is my opinion that the operation of airplanes, both interstate and intrastate, is exclusively within Federal jurisdiction. State courts possess no jurisdiction to grant *injunctive relief* concerning minimum safe altitudes and permissive minimum altitudes when landing or taking off, irrespective of whether the flights are interstate or intrastate. To my mind, it appears a remarkable hybrid jurisdictional doctrine which holds that while Congress has pre-empted Federal jurisdiction over navigable air space, as determined by the United States Civil Aeronautics Board and the Administrator of Civil Aeronautics, the states have retained jurisdiction over the navigable air space *below*

that which has been pre-empted by Federal law. And what appears to be even more astounding is the argument that in landing and taking off, where it is claimed that the flights are dangerously low, the complainants must first establish such fact before the Federal Board or Administrator, and then after such determination, and only then, can the state act by way of an injunction in equity. Such a division of jurisdiction would indeed appear most cumbersome and extraordinary.

The ancient doctrine that ownership of land extends to the periphery of the universe has been modified by air travel. Such airspace is now regarded and declared by Congress to be a public highway: *United States v. Causby,* 328 U.S. 256; *Braniff Airways Inc. v. Nevada State Board,* 347 U.S. 590, 597. In *Roosevelt Field v. Town of North Hempstead,* 88 F. Supp. 177, 187, (E.D.N.Y. 1950) it is said: "The parallel . . . between the sovereignty of the Federal Government in the air space above the United States and that over navigable waters, is true and complete."

As in the case of navigable waters, the airspace is subject to a servitude or easement of air navigation created by the self-executory operation of the Commerce Clause of the Federal Constitution, Art. I, Sec. 8, Clause 3. The airplane's privileges, rights and protection, as far as *transit* is concerned, is derived from the Federal Government alone and not from any state government: see Justice JACKSON in *Northwest Airlines v. Minnesota,* 322 U.S. 292, 303, where he stated: *"Air as an element in which to navigate is even more inevitably federalized by the commerce clause than is navigable water".* (Emphasis supplied)

Consequently, as in the case of navigable waters, of necessity there is a nation-wide basis of air operations under *Federal law.* Air travel must be supported by

uniform Federal law, unfettered by state laws: United States Constitution, Art. VI, Sec. 2.

Congress enacted the Civil Aeronautics Act of 1938, 52 Stat. 984 sec. 205, 49 U.S.C. 425. The Board acting in pursuance of this enactment filed its Regulations. Regulation 60.17 provides that over congested areas the minimum altitude is 1000 feet and in all other areas, 500 feet. However, the Regulation *expressly* states *"Except when necessary for take-off or landing. . ."* (Emphasis supplied) It is the manner of take-off and landing which is the crux of this case. Where, in so navigating, the airplanes fly so low as to dangerously interfere with the use and enjoyment of plaintiffs' premises, it constitutes a "taking" as above stated. I disagree, however, that a state court possesses equity jurisdiction to *enjoin such landings and take-offs as a nuisance.* The Regulations, as interpreted by the Board, fix no standards. Indeed, to do so is obviously impossible. As stated in the oral argument by the learned counsel for the *Amici Curiae,* this is a variable consideration. They may depend upon any one or a combination of circumstances. For example: the situation surrounding the air field, obstructions, type of plane, the weight of the cargo, the condition of the weather and the direction of the wind, etc. Such considerations are necessarily variable. To have *state* courts interpose judicial action would clearly interfere with necessarily exclusive Federal control of air navigation. I agree with counsel for *Amici Curiae* who state in their brief: "Since flights on take-off and landing obviously are indispensable if there is to be any flying at all, there is no reason to suppose that Congress intended to leave such flights outside of its concept of 'navigable airspace.' Indeed, the Civil Aeronautics Act expressly authorizes air traffic regulation down to the surface of the earth.

The 'safe altitudes of flight' for air traffic regulation are the 'minimum altitudes of flight' which fix 'navigable airspace' under the Civil Aeronautics Act (Sec. 1(24), 49 U.S.C. 401(24)), and in which a 'public right of freedom of transit' exists (Sec. 3, 49 U.S.C. 403)."

I do not share in the reliance which the majority places upon *Crew v. Gallagher,* 358 Pa. 541, 546, 58 A. 2d 179, where this Court reversed a decree in equity enjoining an *anticipated* nuisance. Following *Essick v. Shillam,* 347 Pa. 373, 380, 32 A. 2d 416, we again stated ". . . The court cannot anticipate an improper use of the premises and sanction a restraining order founded upon surmise and speculation as to the future conduct of defendants." It is true that there are many statements in the opinion referring to air navigation. However, such matters were not then before us and therefore constitute dicta. Even though that case related to a proposed intrastate air school, sale of light airplanes and renting of hanger space to private plane owners, such intrastate planes in flight and in landing and taking off obviously *could* interfere with interstate commerce. As air navigation is, in my opinion, within exclusive Federal control, a state possesses no jurisdiction to restrain such flights.

Again quoting from the brief of the *Amici Curiae*: "The field of air traffic regulation to which the determination of minimum altitudes of flight belongs, is recognized as one in which maximum safety can be achieved only by uniformity of regulation throughout the nation. Northwest Airlines v. Minnesota, 322 U.S. 292, 303 (Mr. Justice JACKSON concurring) ; see also Chicago & Southern Airlines v. Waterman S.S. Corp., 333 U.S. 103, 107 (1948) ; Rosenhan v. U. S., 131 F 2d 932, 934-5 (C.A. 10, 1942), *cert. den.* 318 U.S. 790; *cf.* Cooley v. Port Wardens, 53 U.S. (12 How.) 299; International Shoe Co. v. Pinkus, 278 U.S. 261, 265

(1929). The Congress, therefore, has occupied and preempted the field of air traffic regulation of all flights (even intrastate flights because they may affect or endanger flights in interstate commerce or along the federal airways) in the entire airspace from the surface up through enacting comprehensive statutory provisions (Civil Aeronautics Act, Section 601, 49 U.S.C. 551) and delegating power to the Board to provide for the necessary detail of regulation. Bethlehem Steel Co. v. New York State Labor Board, 330 U.S. 767, 773-4 (1947); Napier v. Atlantic Coast RR Co., 272 U.S. 605, 612-3 (1926)."

For these reasons I would reverse the order of the court below and direct the dismissal of the complaint upon the ground that the *state* court in equity possesses no jurisdiction, in the facts of this case, to decree a "taking" and award compensation, or to decree injunctive relief.